# EXHIBIT E

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
--------------------------------------
JANE DOE by and through next
friend John Doe, et al.,
Plaintiffs,

v.

APPLE INC.,
Defendant.
Case No. 3:20-CV-00421-NJR
--------------------------------------
HIGHLY CONFIDENTIAL

REMOTE VIDEO DEPOSITION OF
Erik Neuenschwander
December 8, 2023
Lead: Alex Braitberg, Esquire
Firm: Schlichter Bogard LLP

FINAL COPY
JANE ROSE REPORTING 1-800-825-3341

Page 2

ATTORNEYS FOR PLAINTIFFS

ALEX L. BRAITBERG, ESQUIRE
SCHLICHTER BOGARD LLP
100 South Fourth Street
St. Louis, Missouri 63102
Abraitberg@uselaws.com
314.621.6115

CHRISTIAN G. MONTROY, ESQUIRE
MONTROY LAW OFFICES LLC
2812 North Center
P.O. Box 369
Maryville, Illinois 62062
618.223.8200

Page 3

ATTORNEYS FOR DEFENDANTS

ISABELLE ORD, ESQUIRE
DLA PIPER LLP
555 Mission Street
Suite 2400
San Francisco, California 94105
isabelle.ord@dlapiper.com

ERIC M. ROBERTS, ESQUIRE
DLA PIPER LLP
444 West Lake Street
Suite 900
Chicago, Illinois 60606
415.836.2500

Page 4

ALSO PRESENT REMOTELY

Audrey Stano, Esquire, Apple, Inc.

JANE ROSE REPORTING
74 Fifth Avenue
New York, New York 10011
1.800.825.3341
Marie Foley, RMR CRR, Court Reporter
Ingrid Rodriguez, Videographer

Page 309

could provide of face geometry?
A. Not in a general sense. I think that the goal -- I'm using phase geometry to describe what Face ID is trying to collect in the enrollment process with the end result that the device is able to do that local computation and determine if the template -- if the enrolled template data that it has stored is -- with -- at what level of confidence it's matching the data collected from the sensor at the point where those earlier phases of the process had assessed that there is an intent to unlock the device.
Q. So when you say "face geometry," you're just talking about a match between a template and the presentation of the user in an attempt to unlock the phone?
A. I think I'm trying to talk about the data that -- that Face ID process collects from the TrueDepth sensor to inform that process of doing the confidence assessment on the match.
Q. Okay.
What about what Face ID is doing

Page 310

is geometric in nature?
A. I think the way that it uses the TrueDepth camera to come -- to collect -- well, the way it uses the TrueDepth -- the data it extracts from the frames from the TrueDepth camera to generate the match template and then to -- to generate the template and then to generate a -- generate the -- the -- I think it says in here the word. But basically generate the equivalent data that it's going to measure for consistency against the template gen -- the template data to generate a confidence score regarding a match. Those -- those data points input to that process, I think, arise from fine details about the -- the actual shape of features of a person's face in addition to their relative positions to each other or to -- to the head shape, I can't remember. And all of those, that -- that collection of measurements constitutes an assessment of geometry that is suitable for both the creation of the template, which will match faces across a number of different

Page 311

presentations, but reject faces that are not that of the user, or faces that are masks and one that will accept I think I said both, accept, you know, a face in different presentations and reject attacks, loosely speaking.
Q. So let's switch gears here.
With respect to the People Album feature, there's no way for the user to disable that feature if they still want to use photos and take photos of people, right?
A. They can take photos of people with their phone without using the Photos application or features of it.
Q. If someone uses the Photos app and they're taking pictures of people, the People Album is going to automatically cluster pictures of people, correct?
A. Well, I'd just separate that into two parts.
It is possible to take photos in ways that don't use the Photos app. And so independent of if they're taking photos of pictures or -- or whatever, that's a --

Page 312

that's something distinct from whether or not they're choosing to use the Photos app.
Q. Okay.
But what I'm asking is there's no toggle in the Photos app that says don't cluster, right?
A. I'm not aware of any such setting.
Q. Do you know whether there is a setting like that in Google Photos?
A. I have no idea.
Q. Do you know whether it would be possible to -- for Apple to implement a setting like that, to disable People Album clustering?
A. My general position is that all things are possible.
Q. Well, specifically with respect to this, adding a toggle to enable the user to turn off People Album clustering, are you aware of anything that would prevent Apple from doing that?
A. We work hard to reject that there are things that prevent us from

Page 313

creating any feature that we think would be valuable to a user.
Q. So there's nothing you're aware of that that would prevent that feature from being implemented, correct?
A. Categorically, we approach any feature we want to design as something we could overcome whatever challenge to implementing that feature.
Q. Okay. But I'm specifically asking about the possibility of adding a toggle to the People Album, or to the Photos app to turn off People Album clustering.
With respect to that specific possibility, are you aware of any reason why Apple couldn't do that?
A. For any feature that we would contemplate being worth adding for our users we think that we could overcome whatever challenges there might be.
Q. Including that one?
A. Including which one?
Q. The one we're discussing.
A. I -- I believe it true for any

Page 314

feature we can conceive of that has value to the user.
Q. Are you aware of any discussion at Apple of the possibility of adding a toggle that would allow a user to disable People Album clustering?
A. I'm not.
Q. Okay.
Are you aware of any other companies that have clustering features that have toggles that allow users to disable clustering?
A. I haven't used other companies' technology or investigated them.
Q. Okay.
In considering, you know, this --
MR. BRAITBERG: Strike that.
Q. In weighing the utility to the user of certain features against privacy considerations, does competitor behavior ever factor into that analysis?
A. For some it might. We tend to -- overall we're motivated by what we can do for our users, and that's our

Page 315

primary consideration.
Q. Do you know if anybody at Apple considers what competitors are doing in deciding what features to offer?
MS. ORD: Calls for speculation.
MR. BRAITBERG: I asked him if he knows.
A. I -- I think that -- I mean, I'm sure people read what is in the news about what competitors do from time to time. It might inform how they think about Apple's features.
Q. Did there come a time when Apple decided that it wanted to use facial recognition in connection with the Photos app?
A. I don't know that we -- I don't know that we consider -- I don't think we use facial recognition in the Photos app.
Q. Okay.
With respect to including the People Album feature in the Photos app, do you know how the decision to include that functionality was reached at Apple?
A. Not specifically, no.

Page 316

Q. Do you know if that decision had been made by the time you joined Apple?
A. By the time I joined Apple. I would -- I suppose we had -- we had iPhoto before I joined Apple. I can't recall what functionality iPhoto offered, but the creation of the Photos application was subsequent to when I joined Apple.
Actually, sorry. That's not strictly true. Photos was present in v1 of iPhone, which was under development prior to when I joined Apple.
Q. Earlier today we were talking about security breaches, and you -- I believe you testified that you're aware of security breaches involving Apple devices.
Are you aware of any specific security breaches?
MS. ORD: Objection; vague.
A. I -- I can recall certain specific jailbreaks of iPhone.
Q. Are you familiar with the Xcode Ghost compromise that was widely reported in the media?
A. I am.

right now is 4:46 p.m.
(The deposition was adjourned at approximately 4:46 p.m. EST)



CERTIFICATE

STATE OF NEW YORK
COUNTY OF NEW YORK

I, Marie Foley, RMR, CRR, a Certified Realtime Reporter and Notary Public within and for the State of New York, do hereby certify:

THAT ERIK NEUENSCHWANDER, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 16th day of December, 2023.

______________________________
MARIE FOLEY, RMR, CRR



INSTRUCTIONS FOR ERRATA

NOTARY PUBLIC SIGNATURE

Not required unless agreed upon by counsel that notary public signature is required.

Please return a copy of the signed errata within 30 days of receipt, unless otherwise agreed upon by counsel. Once we receive the signed errata, we will distribute an electronic copy to all parties.

RETURN A SIGNED COPY VIA FAX OR EMAIL TO:
FAX: 1-800-825-3341
EMAIL: janerose@janerosereporting.com

Jane Rose Reporting
Administrative Offices
309 S. Main Street
P.O. Box 542
Luck, WI 54853



NOTICE TO READ AND SIGN

This transcript was electronically distributed to DLA PIPER LLP (US) to forward to witness.

ACKNOWLEDGEMENT OF DEPONENT

I, ERIK NEUENSCHWANDER, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

________ ____________________________
DATE ERIK NEUENSCHWANDER

Signed and subscribed to before me this _____ day of _________, 202_.