# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JANE DOE, et al., Plaintiffs, vs. APPLE INC., et al., Defendant. ) Case No. 3:22-cv-02575-NJR

DEPOSITION OF EXPERT WITNESS
JEFFREY DUNN
Volume I
Wednesday, September 17, 2025
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
--oOo--

Reported by: Michael C. Rowell, California CSR #13494
NCRA Registered Diplomate Reporter
NCRA Certified Realtime Captioner



APPEARANCES:

For the Plaintiffs:

SCHLICTER BOGARD
BY: CHEN KASHER, ESQ.
KAITLIN MINKLER, ESQ.,
100 South Fourth Street #1200
Saint Louis, MO 61302
866-943-3161
CKasher@USELaws.com
KMinkler@USELaws.com

For the Defendants:

MORRISON & FOERSTER
BY: RYAN MALLOY, ESQ.
EMMA BURGOON, ESQ.
707 Wilshire Boulevard
Los Angeles, CA 90017-3543
213.892.5482
RMalloy@MoFo.com
EBurgoon@MoFo.com

Also Present: Travis Perry, videographer
Jesse Castro, technician

--oOo--



INDEX OF EXAMINATION
WITNESS: JEFFREY DUNN


| EXAMINATION BY | PAGE |
|---|---|
| Mr. Malloy | 5 |


EXHIBITS FOR REFERENCE


| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 1 | Expert Report of Jeffrey S. Dunn dated 6/27/2024 | 12 |
| EXHIBIT 2 | Expert Supplemental Report of Jeffrey S. Dunn, dated 9/12/2025 | 12 |
| EXHIBIT 3 | Expert Rebuttal Report of Jeffrey S. Dunn, dated 9/16/2024 | 12 |
| EXHIBIT 4 | The IBIA Glossary of Biometric Terms | 44 |
| EXHIBIT 5 | Rebuttal and Supplemental Expert Report of J. Marc Brasher, dated 8/22/2025 | 98 |
| EXHIBIT 6 | Attributes Shape the Embedding Space of Face Recognition Models | 135 |
| EXHIBIT 7 | Glossary - CSRC, printout dated 9/17/25 9:53 a.m. - definition of "identification" | 139 |
| EXHIBIT 8 | Information technology - Vocabulary - Part 37: Biometrics | 150 |


--oOo--



BE IT REMEMBERED, that set on Wednesday, the 17th day of September, 2025, commencing at the hour of 8:00 a.m. (PST) thereof, via Zoom remote videoconferencing, before me, Michael C. Rowell, a Certified Shorthand Reporter of the State of California, there personally appeared

JEFFREY DUNN,

having been called as a witness by the Defendant, who, having been sworn by me to tell the truth, the whole truth, and nothing but the truth, was thereupon examined and testified as hereinafter set forth:

--oOo--

THE VIDEOGRAPHER: Here begins the Media Number 1 in the videotaped deposition of Jeffrey Dunn in the matter of Doe, et al., versus Apple, Inc., in the United States District Court for the Southern District of Illinois, Case Number 3:20-cv-00421-NJR.

Today's date is September 17th, 2025, and the time on the video monitor is 08:00.

The remote videographer today is Travis Perry, representing Planet Depos. All parties of this video deposition are attending remotely.

Would counsel please voice-identify themselves and state who they represent?

65

**A. Could you repeat that question, please?**
Q. Do you agree that "faceprint" and "embedding" are synonymous?
**A. I think the terms are used interchangeably, yes.**
Q. Okay. And what's an embedding?
**A. Embedding is often used to describe the numerical representation of a biometric that's generated from a neural network.**
Q. So would you agree that "faceprint" is narrower than -- strike that.
Would you agree that "faceprint" is broader than "embedding," because faceprints don't have to be generated from neural networks?
MR. KASHER: Objection, mischaracterizes.
You may answer.
THE WITNESS: I'm sorry. Could you repeat that question, please?
BY MR. MALLOY:
Q. Well, do you agree that faceprints don't have to be generated from neural networks?
MR. KASHER: Same objection.
THE WITNESS: I think there are people that use the term "faceprint" for results that were not from a neural network.

66

BY MR. MALLOY:
Q. So "faceprint" is broader than "embedding"?
MR. KASHER: Same objection.
THE WITNESS: "Faceprint" could be used in different ways than "embedding" can be used.
BY MR. MALLOY:
Q. How so?
**A. "Faceprint," I think some people use it to include all of the information that's stored as a result of face recognition, which may or may not be from a neural network.**
Q. What do you mean, "all of the information that's stored as a result of face recognition"?
**A. The numerical data that results from the processing of a face image through a face recognition algorithm.**
Q. How do the fields of computer science and biometrics relate, if at all?
**A. I'm sorry. Could you repeat that question?**
Q. Yeah. How do the fields of computer science and biometrics relate, if at all? Is there a close relationship?
**A. I would agree there's a close relationship. Computer science, of course, covers all aspects of computer technology: software development, hardware development.**
**Biometric systems as they're used today, of course, run on computers, so they definitely make use of hardware and software, and many of the developers of biometric systems have backgrounds in computer science or electrical engineering or other related fields.**

67

Q. Do you think that an expert on biometrics needs to be an expert on computer science?
**A. Well, I'm not sure I understand your use of the term "expert," but someone could be knowledgeable about how biometric systems operate, how to use them, how to train them, how to -- to optimize them, and those skills might come with, you know, a technical background from computer science, but it could be a technical background in electrical engineering or data systems analysis or another technical-related field.**
Q. You would agree that not all software engineers are experts in biometrics?
**A. Yes.**
Q. Have you ever published any articles about convolutional neural networks?
**A. I have not.**
Q. Have you ever published any articles about software development?
**A. I've published written technical papers for internal government use on software quality control and software development measures.**

68

Q. Do you understand the relationship between the terms "machine learning" and "neural networks"?
**A. Yes.**
Q. What's the relationship?
**A. Well, "machine learning" is a broader term that includes neural network technology.**
Q. What else does it include?
**A. Well, machine learning would also include expert systems, so instead of using a neural network to train, you would have a human or a group of humans write the rules for the machine to follow.**
Q. Have you ever published any articles on the creation or use of so-called faceprints?
**A. I have not.**
Q. Have you ever developed your own faceprint technology?
**A. So I've -- as they -- you know, in my role in government, I led many technology development programs, which included developing face recognition systems. You could call the results of those systems faceprints.**
Q. Did you work on the programming of this system?
**A. I did not write the code, but I supervised**

69

**people who did or supervised contractors or college researchers who did.**
Q. And how adept are you at reading source code?
**A. My experience is that having worked on software projects for many years that I could generally review most source code and get a general understanding of how -- what it is doing.**
Q. When did you start -- strike that.
When did you first begin working on this litigation?
**A. To the best of my recollection, the engagement was signed in early 2020 -- or, I'm sorry, in 20- -- early 2021, and I started working some months after that.**
Q. Okay. Did somebody reach out to you about potentially working on this litigation?
**A. I believe someone contacted our President of IDTP to see if we were available to help with it.**
Q. Do you know who that was?
**A. Paul Collier is -- who contacted us?**
Q. Yeah.
**A. Paul Collier is our president.**
Q. Okay. Have you used any information from the Facebook case in this case?
**A. No, other than there was well-known biometric**

70

**reference material that I cited in this case that I may have cited in Facebook. I don't really recall.**
Q. Okay. But the Facebook case was the only other case you'd ever worked on?
**A. The Facebook case is the only case that I gave a deposition on.**
Q. Okay. What is -- strike that.
Did the judge in that case ever criticize or exclude any of your testimony?
**A. No.**
Q. So we talked about the IBIA Glossary earlier in this deposition. Are you aware of any dictionaries or glossaries of biometric terms that are widely used today?
**A. One glossary is published by the ISO, SC 37 Committee, and, you know, there's other examples of government documents where they've included a glossary of biometric terms.**
Q. Do you consider the -- strike that.
Do you consider the ISO SC 37 glossary to be generally accurate?
**A. I consider it a consensus of the, you know, Committee, that that's the term -- the way the terms are going to be used in preparing international standards.**
Q. Any other glossaries that people in the

71

biometric industry commonly use today?
**A. I don't recall any right now.**
Q. One moment.
In the biometric industry, how does one go about determining whether data is biometric or not?
**A. So biometrics is a very -- is a broad term. Usually, it's the measuring a feature or behavior of a person, so it can apply to a wide range of traits, such as finger, face, iris, retina, voice. So depending on the community, the developer, they will choose whether they call their process, you know, a "biometric" or not.**
Q. How would you distinguish between biometric data and biometric-identifying data?
MR. KASHER: Objection.
You may answer.
THE WITNESS: I would have to know the context, but I -- just as terms, I don't understand that there would be much difference.
BY MR. MALLOY:
Q. Okay. Do you think that all biometric data is a biometric identifier?
**A. Well, the term "biometric" was used decades ago, before it became commonly used for biometric authentication, biometric identification technologies. So there are research communities where biometric data**

72

**refers to, you know, agricultural sampling of cows or horses or something. So that community uses biometric data in a different way than the community I'm familiar with.**
Q. Well, so what more does biometric identification data need to make it not just biometric data but also biometric identification data?
MR. KASHER: Objection.
You may answer.
THE WITNESS: I think, as I previously explained, if it's biometric data collected with the purpose of identifying a person, I don't see a difference.
BY MR. MALLOY:
Q. Okay. [redacted]
**A. That the output is the result of the biometric face recognition algorithm.**
Q. Anything else?
**A. I think that's sufficient.**
Q. Did you rely on anything else to base your opinion that the [redacted]
**A. As -- the data that I reviewed in my report,**

101

**A. Yes.**
Q. You didn't read Dr. Jones' expert report, did you?
**A. I did read Dr. Jones' report.**
Q. His supplemental report from August 2025?
**A. Yes, I believe I read that.**
Q. And you understand that he reviewed Apple's source code, correct?
**A. Yes.**
Q. And you understand that he determined that there was end-to-end encryption, correct?
**A. I understand that's what he said in his report, yes.**
Q. And you didn't review the source code for end-to-end encryption, did you?
**A. I did not.**
Q. But nonetheless, you're contending that Mr. Brasher doesn't know what he's talking about?
MR. KASHER: Objection, mischaracterizes.
You may answer.
THE WITNESS: I didn't. My statement was that he did not independently verify the implementation. He appears to have relied on documents from Apple, relied on Jones' report, and relied on testimony from Apple employees.

102

BY MR. MALLOY:
Q. You don't dispute that Dr. Jones independently investigated the source code, do you?
MR. KASHER: Objection.
You may answer.
THE WITNESS: I see that in his report, that he said he stated he reviewed the source code, yes.
BY MR. MALLOY:
Q. Did you find any errors in Dr. Jones' analysis of the source code?
**A. I don't have any errors to report.**
Q. So you're speculating that Mr. Brasher could be wrong about his statements in this report, right?
MR. KASHER: Objection, mischaracterizes what he said.
Please, you may answer.
THE WITNESS: Yes. My point was that in most implementations of cryptographic systems, there's independent testing to verify correct implementation. And my point is, other than Apple's sources or review -- Dr. Jones' review of Apple, I didn't see that Mr. Brasher had provided any independent analysis that he did.
BY MR. MALLOY:
Q. Okay. And you don't know one way -- one way

103

or the other whether Apple has submitted its operating systems and hardware to NIST for testing?
**A. I do not know one way or the other.**
Q. As you sit here today, can you identify one flaw in Apple's end-to-end encryption scheme?
MR. KASHER: Objection, asked and answered.
You may answer.
THE WITNESS: So can you define what you mean by "flaw"?
BY MR. MALLOY:
Q. Yeah, one specific mistake that you believe Apple made.
**A. I don't have any evidence that they incorrectly implemented the software the way they intended to.**
Q. Okay. If you turn to paragraph 32 of this report from Mr. Brasher, August 22nd, 2025, you'll see that Mr. Brasher discusses device recovery.
Do you see that?
**A. Yes.**
Q. And do you understand what a data blob is?
**A. Yes.**
Q. Do you understand that the data blob is the encrypt -- strike that.
Do you understand that a data blob includes

104

[redacted]
**A. Yes.**
Q. And if you turn to paragraph 32 -- 33, there's a sentence in Mr. Brasher's report that reads as follows: "This process is designed so that neither Apple nor any third party can read the passwords or data blob contained within, regardless of whether the data is on Apple servers or a third-party server."
Do you see that?
**A. Yes, I do.**
Q. And this sentence is in a discussion about device recovery.
Do you see that?
**A. Yes.**
Q. Do you dispute Mr. Brasher's analysis here?
**A. I do dispute it, because he did not consider all of the whole system aspects. In particular, he didn't consider the examples I cited in my supplemental report about how Apple employees can recover data, they can recover user ID and password, they can provide data to third parties through subpoenas.**
**So, again, it says Apple. I don't know if that means all employees at Apple or some employees at Apple can't access the data but other employees can. He doesn't really --**

141

**of similar persons or items." I've never heard of biometrics as referring to items.**
Q. One moment. I'm sorry for the pause.
Are you familiar with Dr. Brahnam?
**A. I don't recognize that name.**
MR. KASHER: Could you state the full name, please?
THE WITNESS: Yeah, could you state the full name that you're asking about?
BY MR. MALLOY:
Q. One moment. Are you familiar with Dr. Sheryl Brahnam?
**A. I don't know that name.**
Q. Are you familiar with Arum Sinnreich?
**A. I don't know that name.**
Q. Have you reviewed the ISO Security Guide?
**A. Is this the one produced by SC 37? Or what are you referring to?**
Q. I'm talking about the Apple ISO --
**A. Oh, I'm sorry. I misunderstood your --**
**I reviewed the documents that were provided as a part of this case, so I think it included some kind of security guide.**
Q. Do you know whether it was the ISO Security Guide or no?

142

**A. I don't recall.**
Q. Do you want to check your Materials Considered so you can answer my question?
**A. Just a second, please.**
**I believe the name of the document was the Platform Secured Guide.**
Q. Okay. How about the ISO Security Guide?
**A. I don't recall reviewing the ISO Security Guide.**
Q. Did you ask to review it?
**A. I did not specifically ask for that.**
Q. Did you review the Apple Platform Security Guide?
**A. Yes, I did review that.**
Q. And for what purpose?
**A. One purpose was, it was cited many times in the Brasher Supplemental Report, so I went to review that guide to -- when I was reviewing Brasher's report.**
Q. Okay. Is there anything in the Apple Platform Security Guide that you know to be inaccurate?
**A. There's nothing I know. I don't have a basis of knowing if it's correct or not.**
Q. Okay. What is information system security?
**A. That's a discipline of many aspects that are used to protect information systems, both from internal**

143

**users, from outside adversaries. It really encompasses the whole discipline of safely, securely processing information, allowing access, controlling access, and preventing malicious attacks against a system.**
Q. Okay. Do you consider yourself an expert in information security systems -- I'm sorry, information systems -- let me ask again.
Do you consider yourself an expert in information system security?
**A. Yes. I worked for many years in the NSA Information Systems Security Research Office and the National Computer Security Center, so for 35 years, I worked in the components and principles of information system security.**
Q. Okay. Do you dispute that Marc Brasher is also an expert in information system security?
**A. As I recall looking at his qualifications, he cited his military experience in cyber -- offensive cyber attacks, and there was one mention, and I believe that was added in his supplemental report, that he did InfoSec, or information security, for clients after he left the government.**
Q. Okay. So you don't dispute that he is an expert in information system security?
**A. I --**

144

MR. KASHER: Objection, mischaracterizes his testimony.
THE WITNESS: I don't think he showed extensive experience in information system security. I don't think -- I don't know if he claimed in his report that he was an expert in that area, but I don't think his qualifications showed that he was.
BY MR. MALLOY:
Q. And what more do you contend that he would need to show?
**A. Well, typically, he would show experience working on information system security programs. There's certifications in information system security. The areas of government experience he showed were on, you know, cyber -- they were on the offensive side, cyber operations to support military operations.**
**He didn't work in any of the NSA offices I'm familiar with that are doing information system security.**
Q. Do you think you have any such certifications?
**A. I have my original cryptologic engineer certification at NSA. And then at NSA, during 35 years, I completed 1400 hours in coursework; many of those were on information system security techniques.**
Q. So your NSA encryption certification, you

145

consider it certification in information system security?
A. It is one --
MR. KASHER: Objection.
THE WITNESS: My cryptologic engineer certification is one type of certification for information system security, but there's many others.
BY MR. MALLOY:
Q. What are the others?
A. So there's Microsoft certification programs. There's AWS certification programs. There's programs through NIST. There's commercially available programs that teach information security practices.
Q. And what's the difference between information system security and cybersecurity?
A. Well, cybersecurity is usually considered a subset of information system security. Cybersecurity is looking at preventing external attacks, network attacks, hacker attacks. Information security would include all aspects.
It would certainly include encryption techniques, key management, protecting stored data, but it would also include personnel policies; who has access to the system; how are those people vetted; are background checks run on those people; are procedures

146

like remote work allowed; can users bring their own computers to do remote work or do they have to use a system provided by the institution.
So InfoSec, information security, would be much broader than cybersecurity.
Q. Okay. Can you give me examples of information system security that does not fall within the scope of cybersecurity?
A. I thought I just did that. So doing, you know, personnel policies on who can access the system, who can -- who has administrator privileges, how users are authenticated, whether you can use user-selected passwords or biometrics are required.
So the entire security policy of a system, including, you know, physical access, control, goes beyond what cybersecurity addresses.
Q. Okay. Are there relevant certifications in cyber -- cybersecurity that you contend don't apply to information system security?
A. I'm not sure I understand the question exactly. Are you saying there's -- could you maybe rephrase the question or clarify for me, please?
Q. Sure. So your position -- is it your -- strike that.
Is it your position that if someone is an

147

expert in cybersecurity, they're not necessarily an expert in information system security?
A. Correct, I believe that's true.
Q. And so being an expert in a -- strike that.
Are there any -- strike that.
Can you describe certifications for cybersecurity that are widely recognized in the field?
A. I don't know the names of them, but I know there are certification programs, including internal government certification programs, in cybersecurity.
Q. And does NIST run those programs?
A. I'm not familiar with what NIST does on that.
Q. Do you know what government agencies are responsible for cybersecurity certification?
A. Well, the -- U.S. Cyber Command runs cyber operations for the military. They have their own internal programs to qualify military and civilian personnel to do cyber operations. I don't know the names of those programs.
Q. Okay. Okay. You've -- you've -- strike that.
You've never worked at Apple, right?
A. Correct, I've never worked -- I've never been employed at Apple.
Q. So you don't know anything about Apple's background checks for its employees, correct?

148

A. I have no information one way or another on Apple background checks.
Q. You don't know if they conduct fingerprint-based criminal history checks, correct?
A. I have no information one way or the other.
Q. You don't know if they allow convicted felons to have system privileges, correct?
A. I do not know any information one way or the other on that.
Q. And you don't know if Apple fires employees who violate internal control policies, correct?
A. Correct, I do not know one way or the other.
Q. You didn't review any Apple personnel policies in connection with your reports, correct?
A. Correct, I did not review any personnel policies.
Q. You didn't review any Apple cybersecurity documents, correct?
A. I don't recall seeing any documents that were marked cybersecurity.
Q. How -- strike that.
What is your understanding -- strike that.
What knowledge do you have about how Apple goes about assessing security vulnerabilities -- let me -- let me say it again.

**image or biometric sample or biometric identifier and processing it and storing it in a database or a data file for future comparison.**
MR. KASHER: No further questions.
MR. MALLOY: Okay. I have just a couple of follow-up questions.

EXAMINATION

BY MR. MALLOY:
Q. First, Mr. Dunn, you were just asked some questions from your attorney, correct?
**A. Yes.**
Q. Did you and your attorney prep for those questions --
MR. KASHER: Same objection.
BY MR. MALLOY:
Q. -- during the course of this deposition?
MR. KASHER: Highly improper. You can refuse to answer.
BY MR. MALLOY:
Q. Do you accept your counsel's instruction?
**A. Yes.**
Q. You didn't include the SC 37 glossary in your Materials Considered, did you?
**A. I did not. I don't recall if I listed it specifically, but my coworker is on the SC 37 Committee**



**and attended the last meeting in Singapore, so I'm very familiar with this document already.**
Q. Why did you exclude it from your Materials Considered?
MR. KASHER: Objection.
You may answer.
THE WITNESS: When I prepared my report, I didn't need any quote or any specific information from this document.
BY MR. MALLOY:
Q. You didn't think that the SC 37 definition of "identification" was relevant?
MR. KASHER: Same objection.
You may answer.
THE WITNESS: So the nature of SC 37, and this document in particular, is the development of international standards with specific applications, such as how biometrics are stored on passports, how biometrics are stored on government ID cards.
So it's a fairly narrow segment of the biometric community. Within that community, these definitions make sense, but they may not make sense in the context of more general commercial applications, like Apple is using.
///



BY MR. MALLOY:
Q. And you didn't cite the IBIA glossary in your materials considered either, correct?
**A. I don't believe I cited that IBIA document.**
MR. MALLOY: I have no further questions.
MR. KASHER: Okay. Thank you, everybody.
THE VIDEOGRAPHER: That concludes --
MR. KASHER: We can talk about the spellings. I'm sorry. Please go ahead.
THE VIDEOGRAPHER: This concludes the deposition of Jeffrey Dunn. We are going off the record now at 14:13.
(Thereupon, the deposition concluded at 2:13 p.m. [PST])

Signed under penalty of perjury:

______________________________
JEFFREY DUNN

______________________________
Date

--oOo--



I, MICHAEL C. ROWELL, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript was requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

WITNESS WHEREOF, I have this date subscribed my name.

Dated: September 23, 2025



MICHAEL ROWELL, RDR, CRR, CA-CSR NO. 13494