# EXHIBIT 6

Jane Doe, et al.,

Plaintiffs,

v.

Apple, Inc.,

Defendant.

*CONFIDENTIAL*

VIDEO DEPOSITION OF ARAM SINNREICH, PHD

July 19, 2024

Reporter: John Arndt, CSR, CCR, RDR, CRR
CSR No. 084-004605
CCR No. 1186

MAGNA LEGAL SERVICES

Brooklyn-Queens Expressway in New York City, right, as designed by Robert Moses.

And the argument is that in deciding to make the bridges overs the expressway a certain height, the -- Moses and his collaborates designed a system that would allow people who had cars to reach the vacation destinations that he developed like Jones Beach, while restricting people who relied on buses from reaching those same destinations, because the bridges were too low to accommodate buses.

And the whole idea is that that design decision contains within it the grain of a social engineering decision, which is that vacation destinations should be restricted to wealthier members of society and exclusive to less wealthy members of society.

Q. And so is it fair to say that your work primarily involves analyzing, understanding, and critiquing cultural, social, and political contexts of technology?

MR. BRAITBERG: Objection. Misstates testimony. Lack of foundation.

A. The way that I typically describe it is similar to that, but not exactly that.

What I say is that I research the intersection of culture, law, and technology, and the ways in which



those three different systems of social organization inform and conflict with one another.

BY MR. ROBERTS:

Q. You can flip to Page 32 of your CV if you would like. I just want to ask --

You worked at The New York Press?

A. Yes.

Q. Did any of the work that you did there inform any of the opinions that you offer in this case?

MR. BRAITBERG: Object to form.

I'm sorry, could you repeat the question? I didn't catch it.

Or could you read it back?

MR. ROBERTS: I'll just -- I'll restate it.

BY MR. ROBERTS:

Q. The work that you performed at The New York Press -- did any of that -- or does any of that inform any of your class certification opinions?

A. Not directly, no.

Q. And then you worked at Sinnreich, Wasserman, Grubin & Cayhill (ph) from 1995 to 1996?

A. Yes.

Q. Is that -- again, same question.

Did any of the work that you performed there



inform any of the opinions that you're issuing in connection with class certification?

A. I would say it contributed to my expertise that I brought to bear in forming my opinions.

Q. How so?

A. Well, it's the job where I first began to understand -- well, first of all, and most importantly, like how litigation works as a system.

But secondly, I began to understand the complexities involved in business organizations adopting policies vis-à-vis information and intellectual property that could have unintended outcomes for their customers and their business partners.

Q. Can you give an example of what you experienced in terms of a business organization adopting a policy vis-à-vis information that had an unintentional outcome that you experienced while working at the law firm?

MR. BRAITBERG: Object to form.

A. That's too long ago for me to remember the specifics of any of the cases I worked on.

BY MR. ROBERTS:

Q. You worked at Davis, Polk & Wardwell from 1995 to 1996?



A. Yes.

Q. Did any of the work that you did there -- does it have any bearing on the opinions that you're offering in connection with class certification?

A. Not directly, no.

Q. In terms of the work that you performed at Jupiter Research, you discuss on Page 2 of your report how you dissected the implications of emerging technologies on privacy and regulatory compliance.

What emerging technologies?

A. Back then, it was principally the web and web apps, but it was also the dawn of social media. I was in charge of both the music practice and the policy practice when Apple began to make its entry into the media marketplace.

You know, it was -- I was there for six years, and during that time, personal computers and the internet went from being kind of hobbyist platforms to mainstream infrastructure for public life.

And throughout that, social transformation around the use of technology, I was one of the people who was conducting research on the subject and advising major organizations, including Apple, on the subject.

Q. You're saying you performed work for Apple?



MAGNA Legal Services

A. Apple was one of our clients, yes.
Q. What work did you perform for Apple?
A. I don't recall specifically at this point.
Q. Did you personally perform work for Apple?
A. Yes, I took many meetings with Apple executives during those years.
Q. With whom?
A. I don't recall.
Q. You don't remember a single name?
A. No.
Q. Are you sure they were executives?
A. Yes.
Q. How so?
A. I interacted with them at fora that I hosted. I was part of the strategic consulting arm of the company that worked with customers directly.
It was part of my regular business.
Q. I guess my question is, is do you know -- do you know what a definition of an executive is at Apple?
A. Somebody who's in the leadership structure.
Q. Okay.
And you don't remember any of the leadership at Apple that you worked with?



A. Not directly, no. I left that position in 2022. It's been over 20 years.
Q. I think you misspoke. 2002?
A. Sorry. I did misspeak. 2002.
Q. Okay.
I just wanted to make sure that there was no misunderstanding.
A. That was -- I misspoke.
MR. BRAITBERG: I don't know where you are in your questioning, but it's 12:15. Is now a good time for a lunch break, or --
MR. ROBERTS: Can we get through just a couple more questions about Jupiter Research?
A. Sure.
BY MR. ROBERTS:
Q. The research that you were performing -- was it engineering research?
A. No.
Q. What kind of research was it?
A. There were several kinds of research. One was consumer research. Often survey-based, but not exclusively.
A lot of it was kind of executive research, interviewing executives and decision-makers of a variety of firms to understand kind of emergent changes



in strategy and philosophy of business around technology.
Some of it was kind of more hands-on consulting, where a client would have a particular challenge or question, and we'd kind of roll up our sleeves and work with them to answer those questions and address those challenges.
Q. And do you remember any of the specific projects that you worked on for Apple?
A. No.
Q. Did you draw on any of the work that you performed at -- for Apple at Jupiter Research in forming the opinions that you've reached in this case?
A. Not directly, no.
Q. You also mentioned that you offered insights that shaped industry standards and practice.
What standards did you help shape?
A. I was among the first to publish research on subjects like the use of DRM for the distribution of copyrighted materials on the internet. I was maybe the first one to publish research on that subject.
I was among the first to publish research on the subject of industry ownership consolidation within the internet sector. I was among the first to publish research about the role of peer-to-peer file sharing in



media distribution.
I was pretty widely recognized at that time as a -- was seen as a thought leader in that field.
Q. Okay.
So you've got some areas. I guess my question is, are there specific standards?
A. You mean technological standards?
Q. Yes, or policy standards.
MR. BRAITBERG: Object to form.
A. I mean, not that I can sit here and name, no.
BY MR. ROBERTS:
Q. Is that because there aren't any standards that you actually helped shape? Or is it because you don't remember?
MR. BRAITBERG: Object to form. Lack of foundation.
A. From an engineering standpoint, no, that was never my role. I'm not -- I'm not an engineer and I never sat on the joint pictures expert group or anything like that.
From a business practices standpoint, yes, I developed some of the kind of foundational thinking about the role that technology would play in transforming the media industry.



MAGNA LEGAL SERVICES

But ethnographic field work specifically applies to human beings and their behaviors and statements.

BY MR. ROBERTS:

Q. Okay.

So you called it walkthrough.

You didn't do any walkthrough?

A. No, I did not. I didn't conduct any primary research in the preparation of this report.

Q. What is comprehensive policy analysis? Is it another method or process that you describe in your methodology?

A. Comprehensive policy analysis is kind of a blanket term to describe looking at how policy is developed, how it's executed, and what its downstream affects on the industries and body politics are after it's been executed.

And doing so in a comparative way that evaluates the relative -- the power dynamics between the various stakeholders, the intended outcomes, the actual outcomes, and so on and so forth.

Q. How did you use comprehensive policy analysis in rendering your opinions in this case?

A. I have employed comprehensive policy analysis in a number of my peer-reviewed publications, and the expertise that I derive from doing that



research was part of the foundational expertise that I brought to writing my opinion in this case.

Q. So it's part of your expertise, but you didn't do any comprehensive policy analysis with respect to the opinions that you've issued in this case?

A. I did not undertake any primary research in connection with writing my report in this case.

Q. Okay.

So you didn't do any ethnographic field work in order to issue your opinion as it relates to the matters that you were saying in this case?

MR. BRAITBERG: Objection. Asked and answered.

BY MR. ROBERTS:

Q. Is that right?

A. The ethnographic field work that I've done has informed my published research, which has helped to serve as the basis for my expertise that I relied upon in forming my opinions for this case.

Q. But you did not engage in any primary ethnographic field work in connection with issue this report; correct?

A. I did not conduct any primary research in the preparation of this report.



Q. What is empirical data studies?

A. It's not a term of art. It's just a descriptor that I used to cover a range of different research methodologies that employ quantitative data and analyze them empirically to derive conclusions and intelligence about the way that the world works.

Q. And what empirical data studies did you use in connection with rendering your opinions in this case?

A. I didn't complete any primary research in the preparation of this report for this case, but I've conducted extensive empirical research using quantitative data over the course of my career, and they informed the expertise that I brought to bear in forming my opinions in this case.

Q. Okay.

So what ethnographic field work outside of preparing this report have you conducted involving Apple?

A. Specifically involving Apple?

Q. Yes.

A. Well, I've done a bunch of ethnographic studies, but the two that come to mind are with electronic music producers and with the members of the Kopimism community, both of whom employ Apple



technology in the course of their group affiliations and their professional and devotional practices.

Q. And so those are two instances where you were performing ethnographic fieldwork of users of Apple devices; correct?

A. Yes.

Q. Have you done any ethnographic fieldwork of Apple as a business?

A. No.

MR. BRAITBERG: Object to form.

BY MR. ROBERTS:

Q. Have you performed any comprehensive policy analysis involving Apple?

A. Almost definitely, yes.

Q. What?

A. We could look down my CV if you like, but I've done -- I published a lot of policy analysis, and some of it involves Apple.

Q. In what context?

A. In terms of its data privacy practices, in terms of its business models, in terms of its approaches to data privacy, to intellectual property, and various and sundry other dimensions of its business.

Q. Okay.



MAGNA LEGAL SERVICES

testimony and vague.
A. I have neither asked for nor received any location-based data about specific Apple customers.
BY MR. ROBERTS:
Q. And did you attempt to validate your methodology?
MR. BRAITBERG: Object to the form.
A. No, these are analyses based on available sources that I cite in my report.
BY MR. ROBERTS:
Q. [redacted]
MR. BRAITBERG: Object to the form. Lack of foundation.
A. I would need a more thorough description of the proposed process in order to answer that question.
I apologize. I know we're short on time, but I am going to take a quick bathroom break, if that's all right with you.
MR. ROBERTS: I was actually going to end my questioning.
A. Oh, great.



MR. BRAITBERG: Okay.
MR. ROBERTS: I don't know if you want to close the deposition, or at least for today.
MR. BRAITBERG: If you're done with your questioning, let's do the bathroom break, let's come back, and let's close out the record.
A. Great. I'll be right back.
THE VIDEOGRAPHER: We are off the record at 4:19 PM.
[A recess was taken.]
THE VIDEOGRAPHER: We are back on the record at 4:22 PM.
MR. BRAITBERG: I don't have any questions.
We're going to go ahead and designate the transcript as confidential provisionally.
That's all I have.
MR. ROBERTS: And just to be clear, I think there's like an hour left. We will reserve that time. We may need to talk to you again, we may not. But --
MR. BRAITBERG: Understood.
MR. ROBERTS: Okay.
THE WITNESS: Great.
THE REPORTER: And electronic transcript



for you guys?
MR. BRAITBERG: Yes, please.
THE REPORTER: Okay. Great. Thank you.
THE VIDEOGRAPHER: We are off the record at 4:23 PM.

[SIGNATURE RESERVED.]



C E R T I F I C A T E

I, John Arndt, a Certified Shorthand Reporter and Certified Court Reporter, do hereby certify that ARAM SINNREICH, PHD, prior to the commencement of the examination, was sworn by me on July 19, 2024, to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the proceedings as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in this action.

______________________________
JOHN ARNDT, CSR, CCR, RDR, CRR
CSR NO. 084-004605
CCR NO. 1186



MAGNA LEGAL SERVICES