**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **JANE DOE, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**APPLE INC.,**<br><br>**Defendant.** | **Case No. 3:20-CV-421-NJR** |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

This certified class action arises out of Defendant Apple Inc.'s alleged violation of the Illinois Biometric Information Privacy Act ("BIPA"), 740 Ill. Comp. Stat. 14/1, *et seq*. Plaintiffs allege that Apple violated BIPA when its facial recognition software created digital faceprints from photos saved in Apple's Photos app without the written, informed consent of Illinois users and without establishing a retention schedule and destruction guidelines as required by the Act.

Now pending before the Court are competing motions to exclude expert testimony filed by both Plaintiffs and Apple. For the reasons set forth below, the Court grants in part and denies in part Apple's motion to exclude the expert opinions of Jeffrey S. Dunn and Dr. Sheryl Brahnam. (Docs. 282, 284). The Court grants Apple's motion to exclude the expert opinions of Dr. Aram Sinnreich (Docs. 283), grants Plaintiffs' motion to exclude the expert opinions of J. Marc Brasher (Doc. 285), and grants Plaintiffs' motion to partially exclude the expert opinions of Dr. Creed Jones (Doc. 289).

## LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The *Daubert* standard applies to all expert testimony, whether based on scientific competence or other specialized or technical expertise. *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.137, 141 (1999)).

Under Rule 702, expert testimony is admissible if the witness "is qualified as an expert by knowledge, skill, experience, training, or education" and the proponent of the testimony "demonstrates it is more likely than not that (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." FED. R. EVID. 702. "The district court plays a crucial role as 'evidentiary gatekeeper,' admitting expert evidence only after evaluating: '(1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony.'" *Hillman v. Toro Co.*, 164 F.4th 971, 979 (7th Cir. 2026) (quoting *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778–79 (7th Cir. 2017)).

The "key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion; the inquiry must 'focus . . . solely on principles and methodology, not on the conclusions they

generate.'" *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (citing *Daubert*, 509 U.S. at 595). "So long as the principles and methodology reflect reliable scientific practice, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id*. (quoting *Daubert*, 509 U.S. at 596).

Finally, an expert must explain the methodologies and principles that support his or her opinion; he or she cannot simply assert a "bottom line" or *ipse dixit* conclusion. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (quoting *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010)). "[W]here such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592). The district court possesses "great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (citing *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007)). "The critical inquiry is whether there is a connection between the data employed and the opinion offered." *Gopalratnam*, 877 F.3d at 781 (quotation omitted).

**I. Plaintiffs' Motion to Exclude J. Marc Brasher**

For reasons that shall become evident, the Court first addresses Plaintiffs' motion to exclude the opinions of J. Marc Brasher, Apple's cybersecurity expert. (Doc. 285).

Brasher produced two reports in this litigation, dated June 21, 2024, and August

22, 2025, respectively. (Docs. 285-2, 285-3). Brasher presently is employed as a Cyber AI Research Scientist with Leidos (formerly known as Science Applications International Corporation (SAIC)). He has worked in various cybersecurity and information technology roles for more than 17 years, focusing on Offensive Cyberspace Operations (OCO) and Computer Network Exploitation (CNE). Before transitioning to the private sector, he worked for the National Security Agency (NSA) and U.S. Cyber Command while serving in the United States Air Force.

In his first report, Brasher generally describes how Photos app data is stored and encrypted both on a user's device and in their iCloud account. He opines that Apple cannot access any data associated with faceprints on user devices because it does not possess the necessary encryption key. He acknowledges, however, that under the Standard Data Protection protocol, Apple maintains an encrypted copy of a key that can restore user data at a user's request or in response to a subpoena from law enforcement. (Doc. 285-2 ¶ 26). Users may opt in to Apple's Advanced Data Protection service, which uses end-to-end encryption; Apple does not possess an encryption key for data secured with that service. (*Id.* ¶ 27). Brasher opines that Apple's "overall data encryption regime and other security practices . . . meet or exceed industry best practices . . . ." (*Id.* at ¶ 28). Much of the remainder of his report explains encryption technology generally, and how Apple implements information security protocols, largely relying on its public documentation.

In his second report, Brasher addresses Apple's July 2024 software updates, which synced certain user data to iCloud, including the faceprint data of some users. He opines

that Apple is unable to view or access any of the faceprint data synced to iCloud Photos because it is end-to-end encrypted, and Apple does not have access to the key needed to decrypt the data. Brasher also takes issue with the opinion of Plaintiffs' expert, Dr. Aram Sinnreich, that the updated software poses a substantial security risk.

Plaintiffs contend that Brasher's opinions on encryption should be excluded because they will not aid the jury in understanding any evidence in the case. (Doc. 285). They emphasize that BIPA does not make liability contingent on whether the underlying data is encrypted. They also argue Brasher's opinions are not grounded in sufficient facts and data because he did not conduct any testing or analysis of Apple's systems on his own, merely relying on Apple's own public-facing documents. They note that, during his deposition, Brasher was confronted with deposition testimony from one of Apple's corporate representatives that Apple "can access the encryption keys," prompting him to acknowledge that he might need to revise his opinions if that testimony were accurate. Next, Plaintiffs criticize Brasher as unqualified to opine on Apple's encryption practices, observing that he "has no higher education aside from an associate's degree" in cyberwarfare and has little formal experience working with technology companies like Apple, its devices, or its relevant services, such as encryption or cloud-based storage. Finally, Plaintiffs argue Brasher lacks an adequate methodology to support his opinion on the security of Apple's systems where he conducted no independent testing, and he offered little explanation for how he determined Apple's systems meet industry standards.

In response, Apple contends Brasher's opinion that it cannot access encrypted

users data is relevant to whether it was in possession of users' biometric identifiers. Additionally, it asserts that Brasher's opinions are relevant as rebuttal to Plaintiffs' own expert, Dr. Aram Sinnreich, who opines on the vulnerability of the faceprints to bad actors. Apple insists Brasher's opinions are well supported because he cited and relied on a variety of sources, including Apple's own documents, the testimony of Apple's employees, and industry publications describing security standards. The fact that he did not review source code himself is immaterial, Apple says, because he was entitled to rely on the opinions of other experts who did. And Apple insists that Brasher is more than qualified by virtue of his varied industry experiences to opine on matters in this case. Finally, Apple disputes Plaintiffs' assertion that Brasher needed to personally test its security features, noting that Dr. Sinnreich likewise conducted no testing. It insists that he permissibly compared Apple's security features to NIST and ISO standards, which are subject to peer review and have gained widespread industry acceptance.

Plaintiffs' arguments regarding Brasher's credentials are not persuasive. The Seventh Circuit has noted repeatedly that "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Trs. of Chicago Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Tr. Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787-88 (7th Cir. 2007) (quoting *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005)). Brasher has extensive relevant experience in cyber-technology and encryption, particularly in the military and national security space. Plaintiffs say that this experience does not translate to civilian applications, but they do not explain what differences between civilian and military encryption protocols

render Brasher unqualified to opine on both areas. Again, Brasher's primary opinions rest on a comparison of Apple's security practices to industry standards—standards he says are used by the federal government in its own data security efforts. (Doc. 285-2, ¶ 44; Brasher dep., Doc. 285-4, p. 215). The record suggests that Brasher does have experience working on civilian cybersecurity issues, including as a Senior DevOps Engineer and Consultant at Lodestone Security, Director of Research and Innovations at the Strategic Technologies Analytics Group, and as a Cyber AI Research Scientist at Leidos. (Doc. 285-2, ¶¶ 11, 20-21). Plaintiffs' concerns with Brasher's qualifications may be appropriate grounds for cross-examination, but they do not merit exclusion.

Nevertheless, for reasons explained more thoroughly in the Court's summary judgment order, encryption is not a relevant consideration when determining whether an entity possesses or controls biometric data and, thus, has violated BIPA. Therefore, Brasher's opinions, which focus entirely on Apple's encryption and cybersecurity, are irrelevant to the issue of liability and shall be excluded. To the extent encryption is relevant to the issue of damages, the Court does not believe expert testimony on the strength of that encryption is necessary, and neither party has briefed the issue. Therefore, Brasher's expert opinions shall be excluded.

**II. Apple's Motion to Exclude Jeffrey S. Dunn**

Plaintiffs retained Jeffrey S. Dunn to provide expertise on the biometric nature of faceprints and other data. Dunn is a partner at Identification Technology Partners (IDTP). He has over 20 years of experience leading research and development into biometric identification and authentication at the National Security Agency (NSA) and has

collaborated with a number of federal partners on their biometrics initiatives, including the Transportation Security Administration (TSA), the Federal Bureau of Investigation (FBI), and the Department of Homeland Security (DHS). (Doc. 281-67, ¶¶ 4-5).

Dunn offered five primary merits opinions in his report. First, he described the history and usage of biometrics generally across a range of industry applications. (*Id.* ¶¶ 24-32). He also explained the characteristics of a "good" biometric marker, which include universality, uniqueness, permanence, and ease of use. (*Id.* ¶ 21). Second, he opined on how the terms "scan," "face geometry," "faceprint," and "identification" are used by practitioners in the biometrics community. (*Id.* ¶¶ 40-49). Third, he explains how Apple's Photos app "scans" stored photos via "intelligent face recognition" and "machine learning algorithms" to "recogniz[e] people from their visual appearance." (*Id.* ¶¶ 51-54). Relying on "faceprinting," the app "intelligently suggests names from [users'] Contacts" and "attempts to represent identities of persons in photographs through what Apple calls the 'Person model.'" (*Id.* ¶¶ 61-63, 71). If iCloud is enabled, the person's identity is then synced to the cloud. (*Id.* ¶ 72). Apple does not disable automatic photo sorting in Illinois and does not permit users to disable the feature. (*Id.* ¶ 76). Fourth, he concluded that "based on his experience within the biometric community" and his review of case materials, Apple Photos collects "scans of face geometry" and this data is "biometric." (*Id.* ¶¶ 79-81). He further concluded that "grouping photographs by the faces of the people who appear in them[] constitutes an 'identification' of the person, as that term is understood in the community." (*Id.* ¶ 28). Finally, he opines generally that Apple's collection of biometric information poses security risks to users, such as identity

theft, biometric spoofing, social engineering, surveillance, deepfakes, and black market exploitation. (*Id.* ¶¶ 83-91).

Dunn also prepared two rebuttal reports (Docs. 281-68, 281-69), which contain his responses to the reports of Apple's experts J. Marc Brasher and Dr. Creed Jones. With regard to Brasher, Dunn opined that he is unqualified to offer opinions on cybersecurity and failed to account for potential security risks to Apple's systems. He further criticizes Brasher for relying on Apple's public-facing documents without conducting or citing any independent testing. (Doc. 281-69 ¶ 7). Dunn criticizes Dr. Jones's opinions that "faceprints" are not "scans of facial geometry" and that Apple's use of encryption protects faceprints. He argues that Dr. Jones misses that any attempt to identify a face from a photo, no matter the method, is geometric in nature because it relies on an analysis of the shapes of facial features. (*Id.* ¶¶ 32-33). He also asserts that encryption limits who may read certain data, but it does not fundamentally change what the data represent. (*Id.* ¶¶ 41-42).

Apple argues that each of Dunn's opinions must be excluded. (Doc. 282). It asserts that he lacks expertise in cybersecurity, as opposed to biometrics, and therefore is unqualified to offer rebuttal to Mr. Brasher's opinions. Likewise, Apple asserts that Dunn is unqualified to rebut Mr. Jones's opinions because he has not established any expertise in programming and coding. It also argues that none of Dunn's opinions are grounded in any methodology that can be discerned from his reports. Finally, Apple contends that several of Dunn's opinions would not be helpful to the trier of fact because they are not relevant to any element of Plaintiffs' BIPA claims or they amount to legal conclusions.

Plaintiffs respond that Dunn has sufficient biometrics expertise to assist the trier of fact. They also reject Apple's contention that his opinions lack a reliable methodology. According to Plaintiffs, Dunn "reviewed Defendant's technical documents and deposition testimony, evaluated those materials against industry standards and academic research, and applied nearly three decades of professional experience . . . ." (Doc. 302, p. 8). They assert that any debate about the persuasiveness of this methodology goes to its weight rather than its admissibility. Plaintiffs also insist that Dunn's opinions on "background" matters are proper and would assist the jury in understanding how facial recognition technology works. They add that he is entitled to opine on the risks of biometric technology as he relied on specialized knowledge and can provide necessary context. They further argue that his rebuttal opinions are properly based on his experience in the field. Finally, Plaintiffs contend that Dunn should be permitted to testify about how certain terms are understood by practitioners in the field and that his explanations would not entrench upon the Court's role in deciding legal issues.

Although Apple challenges Dunn's proposed testimony in its entirety, its concerns focus individually on each of his opinions. Plaintiffs do not disagree with Apple's basic framing and organization of Dunn's opinions, and the Court finds it appropriate to structure its discussion in that manner.

**A. *Background Opinion***

Apple first takes aim at the portions of Dunn's report providing general information about the use and history of biometrics, asserting that he lacks a reliable methodology to offer these opinions and that they are irrelevant to the merits issues in

the case. Among other things, Dunn shares his opinion on the characteristics of a "good" biometric marker, discusses the evolution of facial recognition technology from the 1960s to the present, the emerging uses of "machine learning" techniques to process facial images, and the variety of applications for which facial recognition has value. (¶¶ 20-21, 23-24, 30-31). Plaintiffs respond that Dunn relied appropriately on his professional experience in the biometrics field. (Doc. 302). They also contend that his background opinions are necessary to provide context to the jury for his merits opinions.

The Court finds that Apple's concerns regarding the methodological basis for Dunn's background opinions are overblown. It assails his opinion for failing to apply his knowledge to the facts of the case and for citing third-party sources rather than offering any analysis of his own. Neither is of particular concern here.

The majority of Dunn's background opinions clearly are based on his experience in the biometrics industry. "Rule 702 expressly contemplates that an expert may be qualified on the basis of experience." FED. R. EVID. 702 advisory committee's note to 2000 amendment; *see also Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000). In fact, "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." FED. R. EVID. 702, advisory committee's note to 2000 amendment. Apple seems to believe that Dunn relied excessively on third-party sources, but it is not clear why this would be improper. *See* FED. R. EVID. 703.

The Court agrees, however, with Apple's concern that much of Dunn's background opinion would not be helpful to the trier of fact. *See* FED. R. EVID. 702(a). It is true that Rule 702 authorizes "the venerable practice of using expert testimony to educate

the factfinder on general principles." FED. R. EVID. 702 advisory committee's note to 2000 amendment. Rule 702 allows an expert to "testify in the form of an opinion *or otherwise*," which means that the expert may share his or her special knowledge with the fact-finder in areas that might extend beyond the information known to the average person. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 484 (7th Cir. 2020) ("An expert's opinion may overlap with the jurors' own experiences or cover matters that are within the average juror's comprehension, so long as the expert uses some kind of specialized knowledge to place the litigated events into context." (cleaned up)). And Plaintiffs maintain Dunn's background opinions would assist the jury in understanding "how facial recognition works, why faceprints are unique, and the risks posed by the collection of biometric data." (Doc. 302, p. 10). But while the fact-finder may find some background information helpful, the Court doubts that a jury would require anything close to the level of detail discussed in Dunn's report.

For starters, it is not abundantly clear that a jury would require definitional information about biometrics and their uses, given their ubiquity in modern society. (Doc. 281-67, ¶¶ 20, 32). Nor is it apparent that a jury would benefit from Dunn's perspective on what makes a "good biometric marker," (*Id.* ¶ 21), as the quality or advisability of Apple's technology is not directly at issue in this litigation. Likewise, the Court struggles to grasp why a jury would need to be educated in the history of biometric technology (as opposed to the function of the technology itself) to decide the issues in this case. Finally, there is no reason to think that Dunn's discussion about the various risks posed by biometric technologies in general would help the jury decide issues in this

matter, and, in any event, these opinions do not appear to be based on the facts of this case. Accordingly, Dunn will not be permitted to offer the background opinions he describes in his report.

**B. *Definitions Opinion***

Apple next takes aim at the portion of Dunn's report describing how "scan," "face geometry," "faceprint," and "identify" are used by practitioners in the biometrics community. It argues that his opinion only relies on his professional experience rather than an analysis of evidence in the case and that he presents impermissible legal conclusions. Plaintiffs respond that Dunn was entitled to rely on his professional experience to clarify technical concepts rather than instruct the jury on the law.

Again, the Court is not concerned about Dunn's methodology in rendering his opinions. As noted above, Rule 702 allows an expert to educate the jury on general principles. However, Dunn's opinions do tread perilously close to defining key legal terms in the case. This he may not do. *See Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) ("It is the role of the judge, not an expert witness, to instruct the jury on the applicable principles of law, and it is the role of the jury to apply those principles of law to the facts in evidence."); *United States v. Sinclair*, 74 F.3d 753, 757 n.1 (7th Cir. 1996). Dunn's opinion purports to explain the biometric community's use of the terms "scan," "face geometry," "faceprint," and "identify," but each of these, with the exception of faceprint, is a term with legal significance in a BIPA case. One of Apple's principal arguments, after all, is that its technology does not rely on a scan of face geometry and, even if it did, it would not identify users within the meaning of the statute. Dunn's

definitions of these terms would risk confusing the jury.

The Court also is not convinced that his definitions are merely incidental to clarifying technical concepts. For instance, his definition of "identify" comes from the Merriam-Webster dictionary, and he submits that the term is "used in its plain English sense." (Doc. 281-67, ¶ 49). If that is true, then Dunn's testimony on the definition would be unhelpful to the jury and would more closely resemble impermissible legal instruction. Therefore, Dunn will not be permitted to offer his definitions of "scan," "face geometry," and "identify." He may, however, explain how he defines "faceprint," as that is not a statutory term.

**C. *Scanning and Collections Opinions***

Apple next asks the Court to exclude Dunn's opinion describing how the Photos app sorts faces using "faceprinting" technology and synchronizes that data to the cloud. (*Id.* ¶¶ 50-76). It also seeks to exclude his related conclusions that the Photos app collects "scans of face geometry" and that the technology constitutes an "identification" as that term is understood by practitioners in the biometrics community. (*Id.* ¶¶ 79, 82). Apple argues that these opinions suffer from several methodological problems. First, his explanation consists of a summation of quotes and facts from various discovery materials, which it argues is not an adequate methodology. It points out that Dunn admitted at his deposition that he did not independently verify the accuracy of any of the quotes that formed the basis of his opinion. Second, Apple argues that Dunn undertook no effort to explain how he applied his experience to reach his conclusions on the facts of the case. Finally, it argues that his opinion presents an impermissible legal conclusion by

stating that "scans of face geometry" and "faceprints" are biometric identifiers within the ambit of BIPA. Plaintiffs respond that Dunn's opinion is based on an application of his expertise in the field to the record evidence and that Apple's concerns regarding the accuracy or correctness of his conclusions are topics for cross-examination and do not merit exclusion.

The Court agrees with Apple that these portions of Dunn's report are problematic. First, it is not apparent how Dunn reached his conclusion that the Photos app collects "scans of face geometry." (*Id.* ¶ 78). He cites his 28 years of experience in the biometric community, but he does not explain how this experience informed his conclusion. Instead, his report features a smattering of quotes and summations of various discovery materials identified only by their Bates label with little discernable analysis. *Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999) (emphasizing that an expert's opinion must be substantiated). Plaintiffs insist that Dunn's application of his biometrics experience to the record evidence in the case is a valid methodology. Perhaps, but Dunn never explains *how* that methodology played out here. As it stands, Dunn's report reads as a lengthy list of quotes, followed by a litany of *ipse dixit* opinions "[b]ased upon [his] 28 years of experience in the biometric community." Because Dunn did not explain the connection between his experience, the record evidence, and his conclusions, they must be excluded. *See Gopalratnam*, 877 F.3d at 781 (quoting *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) ("[T]he critical inquiry is whether there is a connection between the data employed and the opinion offered; it is the opinion connected to existing data 'only by the *ipse dixit* of the expert' that is properly excluded under Rule 702.")).

**D. *Risks Opinion***

Dunn also opined that Apple's collection of biometric information places users at risk of identity theft, biometric spoofing, "social engineering," surveillance, deepfakes, and biometric black markets. (Doc. 281-67, ¶¶ 83-91). Apple asserts that Dunn fails to explain how any of these risks apply to its technology, his opinions are otherwise irrelevant to any of the issues in the case, and he failed to consider Apple's privacy safeguards or the fact that its faceprints have never been improperly accessed. Plaintiffs respond that Dunn's opinions are case-specific conclusions about the risks of Apple's technology based on his experience in the field. Plaintiffs also insist that Dunn's opinions will help the jury understand the privacy risks of Apple's use of faceprints and why safeguards matter, giving the jury context to evaluate Apple's conduct.

The Court agrees that Dunn's "risks opinions" must be excluded because they will not aid the trier of fact. Dunn explains various harmful consequences that may result if unauthorized actors obtain access to biometric information, but he does not connect those risks to any disputed issue in the case, *i.e.*, whether Apple's "faceprints" are "scans of facial geometry" capable of identifying users. *Daubert*, 509 U.S. at 591. ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."). Dunn's opinions about the risks of disclosure, valid or not, bear little connection to whether the faceprints at issue trigger BIPA liability, and Plaintiffs offer no other theory for their relevance. He, therefore, will not be permitted to testify on this issue.

**E. *Brasher Rebuttal Opinions***

In his September 16, 2024 report and his September 12, 2025 supplemental report

(Docs. 281-68, 281-69), Dunn criticizes the opinions of Brasher, Apple's cybersecurity expert. Dunn argues that Brasher lacks the proper background and experience to offer his opinions because his experience is limited to "offensive cyber operations" rather than the broader field of Information Systems Security. He also criticizes Brasher for failing to consider the possibility that future technology may permit bad actors to circumvent today's encryption and other potential vulnerabilities, such as insider threats or discarded devices.

As discussed above, encryption is not relevant to whether Apple has violated BIPA. Therefore, Dunn's rebuttal to Brasher's report is also unnecessary.

**F. *Jones Rebuttal Opinion***

Finally, Apple asks the Court to preclude Dunn from offering rebuttal to Dr. Creed Jones's testimony. Dr. Jones is Apple's biometrics expert. Dunn criticizes Dr. Jones for distinguishing between "faceprints" and "embeddings," which he says are used interchangeably in the industry. (Doc. 281-69, ¶¶ 28-33). He also opines that Dr. Jones minimizes the risks of storing faceprint data in the cloud (*id.* ¶¶ 34-35), fails to justify Apple's lack of user transparency and consent (*id.* ¶¶ 36-39), and "misstates" the effect of encryption on the data at issue here (*Id.* ¶¶ 40-46). Apple says that Dunn is not qualified to critique Dr. Jones because he does not have any experience reviewing source code, and his opinions are methodologically unsound because he merely repackages publicly available materials as his opinion rather than offering analysis of his own.

The Court is not concerned with Dunn's purported lack of expertise in writing or analyzing source code. None of Dr. Jones's opinions that Dunn critiques are connected to

his review, elsewhere in his report, of Apple's source code. The Court also disagrees that Dunn lacks a reliable methodology behind his criticism of Dr. Jones's distinction between embeddings and "faceprints." Dunn is an expert on facial recognition technology generally and is qualified to opine on the use of the term "faceprint" in the field.

The remainder of Dr. Jones's opinions that Dunn seeks to rebut are either irrelevant to issues in the case or would be unhelpful to the jury. As explained more thoroughly in its summary judgment order, the Court does not find encryption to be a relevant consideration to the issue of liability. And the risks of storing faceprints in the cloud are within the common knowledge of the jury. *See United States v. Curtin*, 142 F.4th 503, 509 (7th Cir. 2025) ("Expert testimony is not helpful if the jury, using logic or common sense derived from everyday experiences, does not need an expert to understand the evidence and arguments presented."). As to Dunn's opinion that Dr. Jones fails to justify Apple's lack of user transparency and consent, Dr. Jones's opinion is simply that the Photos app data must not be biometric if Apple did not reference it in its public-facing biometric security guidance. (Doc. 289-4, ¶ 56). This opinion can be explored on cross-examination; expert testimony is not required to rebut it.

For these reasons, the Court finds that most of Dunn's opinions should be excluded.

## III. Apple's Motion to Exclude Dr. Aram Sinnreich

The Court next turns to Apple's motion to exclude the opinions of Dr. Aram Sinnreich, Plaintiffs' expert on data privacy and cybersecurity. (Doc. 283).

Dr. Sinnreich authored four reports in this case. His first report, dated April 4,

2024, offered three opinions in support of Plaintiffs' motion for class certification, including that collection and monetization of consumer data is central to Apple's business model, consumer data can be de-anonymized, and Apple can "easily" identify Illinois users of Apple devices and services through its customer database, as well as by leveraging "its knowledge of consumers' location and other attributes." (Doc. 281-70).

Dr. Sinnreich's second report, dated June 27, 2024, repeated his class certification opinions and added a merits opinion that the collection of facial biometric information may "allow[] bad actors to more easily impersonate [individuals]" or be used to "discover private and potentially actionable things about [individuals.]" (Doc. 281-71). He supports these claims with summaries of articles recounting eight Apple data security or privacy incidents, even though he acknowledges that Apple updated its security protections after many of these events.

On July 31, 2025, Dr. Sinnreich authored a third report containing four opinions in support of the merits of the allegations in Plaintiffs' Fourth Amended Complaint. (Doc. 281-72). First, he opines that Apple's storage of faceprints in iCloud is harmful and dangerous because it combines the "vulnerabilities of unencrypted local storage with uncontrolled proliferation of sensitive data across a cloud infrastructure" and "creates a serious risk of misrouting or exfiltration." He also states that biometric information is at risk even while locally stored on a user's device. (*Id.*). Second, he opines that Apple's storage of alleged faceprints on cloud servers is at odds with its privacy-first marketing. (*Id.*). Third, he states that Apple's failure to safeguard biometric data "contrasts unfavorably" with its "chief rival, Google." (*Id.*). And fourth, he asserts Apple's privacy

policy fails to disclose the details of the July 2024 software update and misleads consumers to believe that all facial recognition is performed completely on-device. (*Id.*).

Finally, Dr. Sinnreich issued a September 12, 2025 report rebutting the opinions of Apple's experts, J. Marc Brasher and Dr. Creed Jones. (Doc. 281-73). In that report, Dr. Sinnreich opined that Brasher and Dr. Jones incorrectly state that the use of encryption resolves any concerns regarding the storage of faceprints, that faceprint storage on iCloud enables a "harvest now, decrypt-later" risk, that encryption may protect confidentiality but not the immutable nature of face templates, and that Brasher and Dr. Jones's claims that faceprints are not biometric ignore the real-world applications of faceprints, which are inevitably connected to identities.

Apple seeks to exclude all of Dr. Sinnreich's opinions. It says he is unqualified to offer them, he failed to use any reliable methodology, and his opinions are unhelpful and irrelevant to answering the ultimate question in this case: whether Apple possesses or collects biometric identifiers or information.

**A. *Qualifications***

Dr. Sinnreich is a Professor and chair of the Communications Studies Division at American University's School of Communication. (Doc. 194-3). He earned a master's degree in journalism from Columbia University and a master's degree and Ph.D. in communication from the University of Southern California. (*Id.*). The focus of his current work has been on the intersection of culture, law, and technology, including data privacy. (*Id.*). At American University, Dr. Sinnreich's responsibilities include curriculum development, faculty mentorship, graduate advising, and the promotion of

interdisciplinary research projects that bridge communication studies with other academic areas like law and technology. (*Id.*).

Before his tenure at American University, Dr. Sinnreich worked as an Assistant Professor at Rutgers University from 2010 to 2015, and as a Visiting Assistant Professor at New York University from 2007 to 2009, where he taught "at the confluence of law, technology, and privacy." (*Id.*). He also worked as a consultant in the private sector in the early to mid-2000s, where he "led initiatives that navigated the legal complexities of digital media and advertising technologies, ensuring privacy compliance and ethical data use." (*Id.*). Dr. Sinnreich acted as a strategic consultant, publishing market research that "intertwined legal considerations with technology solutions, advising clients on navigating the evolving digital landscape within the bounds of privacy laws." (*Id.*).

Dr. Sinnreich has published four books, most recently *The Secret Life of Data* in 2024, as well as a plethora of peer-reviewed and mainstream media articles on the digital landscape's ongoing evolution. (*Id.*). He also participates in scholarly and industry forums, where he shares his research findings and insights on issues such as digital privacy, intellectual property rights, and the broader societal impacts of technology, and he has given a number of presentations on these topics. (*Id.*).

Apple observes that Dr. Sinnreich has no technical background or training as an engineer, and he did not examine any of Apple's source code for the People album, Apple's servers, or Apple devices. (Doc. 283-1). Dr. Sinnreich has identified no personal publications or experiences evincing a familiarity with Apple's business or products, much less a familiarity with the "extensive technical measures" Apple undertakes to

protect consumers' privacy. (*Id.*). He also admitted he does not know how Apple's encryption technologies work. Thus, Apple argues that Dr. Sinnreich is not qualified to opine on biometric data and technology, Apple's business, or Apple's data security practices.

In response, Plaintiffs contend that Dr. Sinnreich is qualified to opine on these issues, given that he has extensive experience as a consultant studying the landscape of data privacy risks. (Doc. 300). "As a long-time consultant, researcher, and published author," Plaintiffs assert, "Dr. Sinnreich is well qualified to opine regarding industry standards involving the collection, monetization, and market value of biometric data . . . as well as on data security standards and norms." They further assert it is unquestionably proper for an expert to rely on public business filings and sources that have strategically analyzed Apple's business practices. (*Id.*).

Apple, in reply, argues that Dr. Sinnreich's degrees in journalism and communications, his research and writing on sociology and policy, and his roles as a communications professor and musician do not support Plaintiffs' claim that Dr. Sinnreich has "30 years of expertise as a technology industry researcher and analyst." (Doc. 311).

The Court agrees with Apple that Dr. Sinnreich is not qualified to provide the opinions he rendered in this case. Dr. Sinnreich, no doubt, has an extensive background in digital media and its intersection with the law and ethics. Yet, many of Dr. Sinnreich's publications focus on the intellectual property aspect of digital data—copyright, fair use, and piracy—not on privacy as it pertains to biometric information and Apple's business

practices. His prior expert witness consulting has been limited to the "prevailing norms" within the "branded marketing industry," "prevailing norms and economic relationships within the tech and media industries," and digital distribution rights. (Doc. 281-74, pp. 12-13). Dr. Sinnreich also has no professional experience evaluating source code, and he has had no specialized training in software development, computer science, or computer programming. With regard to encryption, Dr. Sinnreich testified that he has a "stronger than average understanding of how encryption works," but he has no specialized knowledge of how encryption is used on Apple devices or in the context of iCloud Photos. (*Id.*, p. 7). In sum, Dr. Sinnreich's general experience does not allow him to comment on the specific issues he opines on here: Apple's business model, whether and how the People album feature collects biometrics, Apple's ability to de-anonymize data, and Apple's data security practices. The Court, therefore, finds that Dr. Sinnreich lacks the qualifications to put forth his opinions in this case.

**B. *Methodology***

Apple also argues that Dr. Sinnreich did not employ any methodology when coming to his opinions. Instead, he gave narrative descriptions of Apple's business model, marketing strategy, and alleged data collection and security practices based on his review of Apple's financial reports, articles from publications like *Forbes* and *Rolling Stone*, and the work of other researchers. He offers no explanation as to how he concluded that consumer data can be de-anonymized. Absent a sound methodology, Apple argues, Dr. Sinnreich's opinions are nothing more than unreliable guesses.

Plaintiffs, in response, contend that Dr. Sinnreich's opinions are grounded in the

"methodologies [he] typically uses[s] in [his] academic practice, including ethnographic fieldwork, comprehensive policy analysis, and empirical data studies." (Doc. 300). Although Dr. Sinnreich admittedly did not produce any primary research or generate new data for his report, he stated that his opinions were "grounded in [his] three decades of extensive research, scholarship, and study, as well as an informed and in-depth consideration of publicly available information, from which [he] drew informed inferences and conclusions." (*Id.*). Plaintiffs assert that expert testimony does not need to be scientific in character and can be qualitative rather than quantitative yet still meet the *Daubert* standard so long as the expert adheres to the standards of intellectual rigor that are demanded in that expert's professional work. And here, Dr. Sinnreich employed the same methodology he used when writing *The Secret Life of Data*, which was peer-reviewed and found sufficiently reliable to be published by MIT Press. Plaintiffs also aver that Dr. Sinnreich's opinions are corroborated by the record, including by Apple's own witnesses and documents.

Apple, in reply, argues that Dr. Sinnreich must still employ a reliable methodology even as a social scientist, and Dr. Sinnreich's own testimony confirms that his opinions fall short of the intellectual rigor that is demanded in his professional work.

The Court agrees with Apple that, even if Dr. Sinnreich were qualified to give his opinions, he failed to employ a valid methodology. In the "Assignment and Methodology" section of Dr. Sinnreich's First Report, he states that he came to his conclusions by relying "upon my expertise in methodologies I typically use in my academic practice, including ethnographic fieldwork, comprehensive policy analysis,

and empirical data studies." (Doc. 281-71, p. 7). Yet, Dr. Sinnreich explicitly testified that he employed none of those methods to reach his opinions here. (Doc. 309-7). And when asked how he determined "who to believe" when reviewing the sources he relied on, Dr. Sinnreich could not answer the question. (Doc. 311).

The majority of Dr. Sinnreich's opinions result from cherry-picking deposition testimony and citing publicly available articles. Therefore, Dr. Sinnreich will also be excluded for failing to use a proper methodology.

**C. *Relevance and Helpfulness***

Finally, Apple contends that none of Dr. Sinnreich's opinions are relevant to whether Apple collects or possesses alleged biometric identifiers and information, including how Apple collects "faceprints," the sorting and clustering process used by the People album feature, how the feature's data is stored on a user's device, or how any associated encrypted data is synced to iCloud Photos. Thus, his opinions will not help the fact-finder determine whether Apple collects or possesses biometric identifiers and information through its People album feature.

Plaintiffs respond that Dr. Sinnreich's opinions are relevant and helpful because they (1) relate to Apple's state of mind and (2) rebut Apple's affirmative defenses relating to the damages issues in the case. Specifically, his opinion on Apple's incentives and systems for collecting and protecting private data are helpful in proving its state of mind. And his opinion on the dangers posed by the nonconsensual collection of biometric data goes to damages.

In reply, Apple asserts that experts cannot opine on state of mind, and

Dr. Sinnreich's opinion regarding the dangers of collection of biometric data does not specifically address the People album.

It is true that an expert cannot opine on the defendant's state of mind. *See DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) ("He could give an opinion as an engineer that reducing the padding saved a particular amount of money; he might testify as an engineer that GM's explanation for the decision was not sound (from which the jury might infer that money was the real reason); but he could not testify as an expert that GM had a particular motive."). Here, Dr. Sinnreich opines that a significant amount of Apple's revenue is tied to the monetization of consumer data, and as its hardware sales begin to stagnate due to market saturation, "an increasing percentage of Apple's revenue is likely to come from the *market exploitation of its users' data*." (Doc. 281-71, p. 9) (emphasis added). This constitutes improper testimony regarding Apple's state of mind. Dr. Sinnreich's opinions are also irrelevant because they do not address whether Apple violated BIPA, they are unhelpful to the jury as they are mostly common sense, and they do not directly relate to the People album.

For these reasons, Dr. Sinnreich's opinions shall be excluded entirely. He is unqualified to opine on the data privacy issues presented by the complex technology at issue here, he applied no methodology, and his opinions are not helpful to the jury.

**IV. Apple's Motion to Exclude Dr. Sheryl Brahnam**

Dr. Sheryl Brahnam, an expert in machine learning, was retained by Plaintiffs to opine on whether and how the Photos app collects scans of face geometry, identifies individuals based on those scans, and stores face identity data in iCloud. (Doc. 280-55,

¶ 1). Dr. Brahnam offered two reports: a June 27, 2024 Expert Report and a September 16, 2024 Rebuttal Report (Doc. 281-65).

As relevant to Apple's motion (Doc. 284), Dr. Brahnam's report explains that Apple's facial recognition technology uses a convolutional neural network ("CNN") to generate a 128-dimensional vector for each face detected in a photo. (*Id.* ¶¶ 81, 94). According to Dr. Brahnam, the vector, *i.e.*, faceprint, is a "compact and standardized representation of the unique facial features of a face extracted from a photo." (*Id.* ¶ 91).

Dr. Brahnam further opines that the CNN relies on feature maps to extract meaningful information from images. (*Id.* ¶ 96). She defines feature maps as "the representation of detected features within the image, obtained through the process of convolution and the pooling layers." (*Id.*). More specifically, she explains that Apple's CNN detects patterns such as edges, textures, and shapes by convolving filters across the image, and with each layer, the features become more complex and abstract, "allowing the model to identify more high-level concepts like specific facial features and entire faces." (*Id.*). "Otherwise put, a feature map is the spatial representation of the location of detected features in an image." (*Id.* ¶ 41).

Dr. Brahnam concludes that faceprints and feature maps are "scans of face geometry." She explains that, in the field of machine learning, face geometry can be defined "as a representation of the structure and arrangement of facial features" and includes both details of a face's features and the broader shapes and arrangements of those features. (*Id.* ¶ 97). Here, Apple's CNN creates faceprints by scanning face geometry through a series of convolutions. (*Id.*). The final output, the faceprint, thus contains "the

essential aspects of face geometry: the identifying shapes of facial features, the curvatures of face contours, lips, cheeks, and eyebrows, and more. As such, faceprints are 'scans of face geometry.'" (*Id.*).

Apple seeks to exclude Dr. Brahnam's opinions that "feature maps" and "faceprints" are "scans of face geometry" used to "identify" people for three reasons. (Doc. 284). First, it says Dr. Brahnam is not qualified to offer opinions on these terms of art when she is not an expert in biometrics. Second, she employed no methodology in formulating her opinions. And third, Dr. Brahnam's opinions that faceprints and feature maps are scans of face geometry are improper legal conclusions cloaked as an expert opinion. Apple asserts that "scan of face geometry" is a BIPA-specific statutory term that must be interpreted by the Court before the finder of fact can apply it to the facts of this case.

**A. *Qualifications***

Dr. Brahnam is a professor at Missouri State University in the Department of Information Systems and Cyber Security. (*Id.* ¶ 5). She has both M.Sc. and Ph.D. degrees in computer science and has extensive experience in machine learning, with a focus on bioinformatics, face recognition, face synthesis, and automatic face perception classification. (*Id.* ¶¶ 4, 7). She has authored over 200 publications in high-ranking journals and has edited multiple books and other publications related to machine learning and biometrics. (*Id.* ¶¶ 8-9).

Apple assails Dr. Brahnam's qualifications to opine on terms used in BIPA because she admits she is not an expert in biometrics, did not study biometrics, does not teach

biometrics, does not work in the biometrics field, and testified at least six times that she was not asked to opine on biometrics. Because she could not discuss how "scan," "face geometry," or "faceprint" are used in the field of biometrics, Dr. Brahnam instead relied on general dictionary definitions of these terms and could not confirm whether definitions published by the International Biometrics and Identity Association (IBIA) are accurate. Apple contends she is incapable of rendering an opinion on the meaning of these terms in the field of biometrics; thus, her opinions regarding these terms should be excluded.

"Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)). The relevant question is not whether the expert is qualified generally, "but whether [her] qualifications provide a foundation for [her] to answer a specific question." *Id.* at 617 (quotation omitted). A court must look at each of the expert's conclusions and determine whether the expert "has the education, skill, and training to reach them." *Id.*

Apple argues that this case is about the *Biometric* Information Privacy Act, so the fact that Dr. Brahnam is not an expert in biometrics renders her unqualified to define biometric terms. However, Apple's citation to Dr. Brahnam's testimony regarding her purported lack of biometrics expertise is incomplete. When asked whether she considers herself an expert in biometrics, Dr. Brahnam responded: "I'm not a certified biometrics expert or professional. *However, biometrics does depend on the automatic recognition or*

*identification of people through machine learning, and I am an expert in machine learning.*" (Doc. 280-34, p. 19 (emphasis added)). And there is no dispute that Apple's facial recognition technology relies on machine learning and deep neural networks. The Court therefore finds that Dr. Brahnam is well qualified to offer her opinion on the meaning of "faceprint" within the field of machine learning. However, because "scan" and "face geometry" are statutory terms, she may not opine on their definition. *See Jimenez*, 732 F.3d at 721.

**B. *Methodology***

Apple next argues that Dr. Brahnam's opinions should be excluded because she applied no reliable methodology. Instead, she offered definitions of words like "faceprint" based on their dictionary definitions. Apple argues that her lack of familiarity with biometric terms and her testimony that she was not asked to opine on biometrics demonstrates the lack of an adequate methodology.

The Court disagrees and finds that Dr. Brahnam employed a sound methodology. Dr. Brahnam reviewed Apple's model files in developing her opinions regarding Apple's faceprinting CNN. As Plaintiffs explain, Dr. Brahnam used her extensive experience in machine learning to analyze Apple's CNN, then she translated her findings into terms that a layperson could understand. (Doc. 305, pp. 10-11). This is a sound methodology for developing expert conclusions. *See* FED. R. EVID. 702 advisory committee's note to 2000 amendment; *Walker*, 208 F.3d at 591.

Apple also takes issue with Dr. Brahman's use of the dictionary definition of "faceprint" in her rebuttal report because she does not purport to offer a definition that

applies to the biometrics industry. The Court is not persuaded. Dr. Brahnam explains how the ordinary meaning of the word "faceprint" is applied to the machine learning industry. Dr. Brahnam opines that "faceprint" is defined by the Oxford English Dictionary as "an impression left by a face" or "a computer-generated record of specific characteristics of a person's face, used in computer-aided facial recognition."[1] (Doc. 281-65, ¶ 44). She also states that the term appears in scholarly papers on face recognition, where it refers to a "biometric sample" and a "template" that captures the features of an individual's face. (*Id.*). She then explains how faceprints are generated by CNNs and the information that faceprints encode—and there is no dispute that the Photos app technology uses a CNN.

The Court therefore finds that Dr. Brahnam employed a sound methodology when she reviewed Apple's model files and formulated her opinions based on her knowledge and experience in the field of machine learning.

**C. *Improper Legal Conclusion***

Finally, Apple argues that allowing Dr. Brahnam to opine that the People album feature creates feature maps and faceprints that are "scans of face geometry" would usurp the role of the Court in instructing the jury.

The Court agrees. Although Dr. Brahnam is qualified to explain the meanings of feature map and faceprint in the field of machine learning, her opinions that feature maps and faceprints are "scans of face geometry" are legal conclusions that invade the province

[1] While taking issue with Dr. Brahnam's use of the dictionary definition of "scan," Apple itself claims its CNN "scans" images under the colloquial understanding of the word. (Doc. 306-2, ¶ 35; Doc. 306-5, p. 3; Doc. 280-13, p. 21).

of the jury. Thus, Apple's motion is granted in part—only to the extent that it seeks to exclude Dr. Brahnam's legal conclusions that the outputs of Apple's CNN are "scans of face geometry."

## V. Plaintiffs' Motion to Partially Exclude Dr. Creed Jones

Dr. Creed Jones, an expert in biometrics, was retained by Apple to provide his opinions on aspects of the Photos app and People album. Dr. Jones provided three expert reports: (1) an opening report dated June 21, 2024 (Doc. 289-2), (2) a rebuttal report dated July 31, 2024 (Doc. 289-3), and (3) a rebuttal and supplemental report dated August 22, 2025 (Doc. 289-4).

Plaintiffs do not challenge Dr. Jones's qualifications or his methodology. Instead, they only assert that his opinions regarding the terms "scan," "faceprint," "geometry," and "identify" must be excluded as unhelpful to the jury. Plaintiffs also assert that Dr. Jones's opinions regarding the definitions of these terms are impermissible because they are contrary to the record, conflict with his own prior opinions, and are legal conclusions that usurp the Court's role in statutory interpretation.

Apple responds that Dr. Jones's opinions on the technical terms contained in BIPA would be useful to the Court as it construes the statute. And, it asserts that Plaintiffs' claim that Dr. Jones's testimony is inconsistent with the record is wholly meritless and would not justify excluding his expert opinions in any event.

### *A. Definitions of Scan, Faceprint, Geometry, and Identify*

As to "scan," Dr. Jones references a textbook on image processing to define the term as "the capture of an image, especially from specialized equipment such as a flatbed

scanner or a medical imaging device" or "the organization of an image in memory," which involves "a sequential process of walking along a row of pixels." (Doc. 289-3, ¶¶ 15-16). He notes that the authors do not use the term "scan" in their discussion of deep neural networks. (*Id.* at ¶ 17). He also cites a textbook called "Deep Learning," which does not use the term "scan" to describe the operation of a CNN. (*Id.*). Based on these definitions, he opines that Dr. Brahnam's belief that Apple's Photos app is "scanning" a face does not accurately reflect the way that CNNs operate on digital images. (*Id.* at ¶ 14).

Dr. Jones also opined that Apple's facial recognition process does not employ "faceprints" because it relies on vectors that "represent patterns of color and intensity . . . divorced from geometrical considerations such as facial dimensions and landmarks." (Doc. 289-4, ¶ 29). He opines that "face geometry" in the field of biometric identification refers to the three-dimensional shape of the facial structure. (Doc. 289-3, ¶ 19). Relatedly, Dr. Jones defines "geometry" as "the branch of mathematics that defines and relates the basic properties and measurements of line segments and angles." (*Id.* ¶ 28). Finally, Dr. Jones stated at his deposition that "biometric identification" only occurs when the at-issue data is compared with an "external database of identifying information." (Doc. 289-5, p. 201).

The Court agrees with Plaintiffs that Dr. Jones's definitions constitute impermissible legal conclusions rather than explanations of how Apple's technology functions. Dr. Jones purports to define the terms as they appear in BIPA, and it is well settled that an expert may not testify "about legal issues on which the judge will instruct the jury." *United States v. Sinclair*, 74 F.3d 753, 758 n. 1 (7th Cir. 1996); *see also Good Shepherd*

*Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). "Scan," "Geometry," and "Identify" are all terms with legal significance in BIPA litigation. To the extent Dr. Jones's opinions suggest that his definitions of these terms are controlling, his testimony would trench onto the role of the Court, creating the risk that "the jury should look to [him] for legal guidance." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 610 (7th Cir. 2006).

Apple asserts that Dr. Jones's definitions of these terms exemplify how they are employed in the biometrics community and, thus, are relevant to ascertaining the intent of BIPA's drafters. They rely on *Van Buren v. United States*, where the Supreme Court explained that "[w]hen interpreting statutes, courts take note of terms that carry 'technical meaning[s].'" 593 U.S. 374, 388 (2021) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 73 (2012)). In that case, the Court was asked to construe the phrase "exceeds authorized access" in the Computer Fraud and Abuse Act of 1986. *Id.* at 378. Rejecting the broad reading of the statute urged by the Government, the Court elected to construe the word "access" according to its "'well established' meaning in the 'computational sense'—a meaning that matters when interpreting a statute about computers." *Id.* (citing American Heritage Dictionary 10 (3d ed. 1992)).

Apple appears to suggest *Van Buren* leaves room for expert opinions on the meaning of statutory terms. But the Court did not endorse that idea. Instead, the case stands for the unremarkable proposition that "when a statute . . . is addressing a . . . technical subject, a specialized meaning is to be expected." *Id.* at 388 n.7 (citation modified). So it made sense for the Supreme Court to select the technical definition of

"access" rather than a more generalized definition. The meaning of statutory terms, after all, is a "subject for the court, not for testimonial experts." *United States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008). "Judges do not need expert testimony to interpret and apply domestic statutes." *Hillman v. Toro Co.*, 164 F.4th 971, 980 n.4 (7th Cir. 2026). Therefore, Dr. Jones may not offer opinions as to the definitions of "scan," "geometry," and "identify."

Because "faceprint" is not a term that appears in BIPA, however, Dr. Jones may testify as to his definition of the term. While Plaintiffs argue that Dr. Jones's position on the meaning of "faceprint" contradicts the record, which includes numerous instances of Apple employees referring to the vector as a "faceprint," the Court finds that this argument goes to his credibility rather than the admissibility of his opinion.

***B. Encryption***

Plaintiffs also argue that Dr. Jones's opinions on encryption are irrelevant to the claims at issue and, therefore, inadmissible. Based on his review of Apple's source code, Dr. Jones opined that the Photos app encrypts embeddings (*i.e.*, faceprints) before syncing them to iCloud, and that the encrypted embedding is not in a form "that is usable for facial recognition." (Doc. 289-2, ¶ 33; Doc. 289-3, ¶ 62; Doc. 289-4, ¶ 13). Plaintiffs also seek to preclude Dr. Jones from testifying about encryption because he admitted during his deposition that he did not consider himself to be an expert on cryptography or encryption. (Doc. 289-5, p. 23).

As discussed more thoroughly above and in the Court's Order on the parties' motions for summary judgment, encryption is not a relevant consideration when

determining whether an entity has violated BIPA. Accordingly, Dr. Jones's opinions regarding encryption are irrelevant and shall be excluded.

## CONCLUSION

For these reasons, Apple's Motion to Exclude the Expert Opinions of Jeffrey S. Dunn (Doc. 282) and Apple's Motion to Exclude the Expert Opinions of Dr. Sheryl Brahnam (Doc. 284) are **GRANTED in part and DENIED in part** as specified in this Order.

Apple's Motion to Exclude the Expert Opinions of Dr. Aram Sinnreich (Doc. 283) is **GRANTED**.

Plaintiffs' Motion to Exclude the Expert Opinions of J. Marc Brasher (Doc. 286) is **GRANTED**.

Plaintiffs' Motion to Partially Exclude the Expert Opinions of Dr. Creed Jones (Doc. 289) is **GRANTED in part and DENIED in part** as specified in this Order.

**IT IS SO ORDERED.**

**DATED: September 30, 2026**

**NANCY J. ROSENSTENGEL**
**United States District Judge**